UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**JESUS ESPINOZA,**  Civil Action No. 4:23-cv-1532
**on behalf of the Baker Hughes**
**Company 401(k) Plan**

     **Plaintiff,**

v.

**BAKER HUGHES HOLDINGS, LLC,**

     **Defendant.**
_____/

## CLASS ACTION COMPLAINT

Plaintiff, Jesus Espinoza ("Plaintiff"), respectfully files this Class Action Complaint against Defendant Baker Hughes Holdings, LLC ("Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA"). Specifically, Defendant violated ERISA by causing the Baker Hughes Company Retirement Plan ("Plan") to pay excessive and unreasonable compensation to the Plan's recordkeeper resulting in unreasonably high costs to Plan participants. In further support thereof, Plaintiff alleges as follows:

### BRIEF OVERVIEW

1. This class action is brought against Defendant, the Plan's fiduciary, for breach of Defendant's ERISA fiduciary duty to prudently administer the Plan.

2. "ERISA is a remedial statute designed to ... protect the interests of plan participants and beneficiaries. ... Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of Plaintiff's pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d

586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996)

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees paid by Plan participants to administer the Plan can dramatically reduce the amount of benefits available when participants are ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

5. The impact of excessive fees or compensation to third-party service providers on employees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

6. As of December 31, 2021, the Plan had $3,815,191,486 in assets and 24,098 participants with account balances as of the end of the plan year. Instead of leveraging the Plan's assets and tremendous bargaining power to benefit Plan participants, Defendant caused the Plan

to pay unreasonable and excessive compensation for recordkeeping and other administrative services to the Plan's recordkeeper, Empower Retirement. On January 1, 2020, Defendant caused the Plan to change its recordkeeper from Alight Solutions to Empower Retirement. However, for purposes of this Complaint the identity of the recordkeeper is not material.

7. Defendant agreed to compensate the Plan's recordkeeper by allowing the recordkeeper to receive compensation via "float" on Plan participant money. "Float" is money in transit in or out of the Plan. Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan, that money will first pass through the recordkeeper's clearing account. Plan participant money typically sits in the recordkeeper's clearing account for at least 2-3 days (often much longer). Defendant has agreed any investment returns and/or interest earned on Plan participant money while it is in the recordkeeper's clearing account shall belong to the recordkeeper. This is an <u>additional</u> form of compensation – indirect compensation – the recordkeeper received from the Plan.

8. There are nearly $4 billion of assets in the Plan. The Plan's Annual Form 5500 disclosures show that during the Class Period the daily average Plan cash in the recordkeeper's clearing account was at least $2 million. A five-day float using present value shows that if the recordkeeper invested the float in a simple S&P 500 fund, the recordkeeper would have earned $7,843,000 from "float" during the Class Period. During the Class Period, the Plan earned a return of approximately 5.30%, if the recordkeeper's investment of the "float" equaled the return of the Plan, it would have earned $3,480,826.

9. The Department of Labor has issued guidance concerning fiduciary duties for payment of compensation by plan sponsors to recordkeepers via float. The Department of Labor instructs that an ERISA fiduciary acts imprudently when it allows recordkeepers to receive float

compensation, unless plan fiduciaries, substantively understand the arrangement, monitor the compensation received by recordkeepers from float, negotiate the amount, and include the compensation in the total mix of compensation a recordkeeper receives from a plan for providing service to the plan. This is a common-sense approach.

10. In 2002, the Department of Labor issued Field Assistance Bulletin 2002-3 (Nov. 5, 2002), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03. Specifically, the bulletin describes what a fiduciary needs "to consider in evaluating the reasonableness of an arrangement under which the service provider will be retaining 'float' and what information [] a service provider [is] required to disclose to plan fiduciaries with respect to such arrangements…" *Id*. at \*1. The document then sets out steps that plan fiduciaries and service providers should take to ensure that float practices are adequately disclosed, reviewed, and compensation is reasonable – as required by ERISA.

11. In short, Defendant has not tracked, monitored, negotiated, or even substantively recognized that the Plan's recordkeeper receives as compensation millions of dollars from float compensation. This is money that should have been used to reduce or offset completely the additional millions of dollars in fees the recordkeeper received from the Plan during the Class Period. It was imprudent for the Defendant, as noted by the Department of Labor, to ignore millions of dollars in compensation received by the recordkeeper from the Plan.

12. Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendant's unlawful conduct. Plaintiff and the putative class members are entitled to receive benefits in the amount of the difference between the value of their individual Plan accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as

described herein.

13. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

14. Defendant did not adhere to fiduciary best practices to control Plan fees and expenses. To the extent that Defendant made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation the recordkeeper received from the Plan was reasonable.

15. Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

16. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

17. This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## THE PLAN

18. The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

19. The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

20. More specifically, the Plan is a "defined contribution" or "individual account" plan

within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

21. Eligible current and former employees of Defendant are eligible participate in the Plan. The Plan provides the primary source of retirement income for many of Defendant's former employees.

## THE PARTIES

### *Plaintiff & Standing*

22. Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because he is eligible to receive benefits under the Plan. Plaintiff is a current participant in the Plan.

23. In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

24. The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

25. Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

26. To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because he participates in the Plan and was injured by Defendant's unlawful conduct.

27.     To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiff alleges such an injury for the claim herein.

28.     In other words, the Plaintiff has standing because the challenged conduct, including Defendant's actions resulting in Plaintiff and the class members paying excessive fees to the recordkeeper, affected all Plan participants in the same way, including Plaintiff.

29.     Plaintiff's individual account in the Plan suffered losses because his Plan account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and prudently monitored and controlled fees to a reasonable level. That money should have gone towards retirement.

30.     Plaintiff is currently invested in the Plan and, as such, continues to pay the excessive recordkeeping and administrative fees identified herein. As a current participant in the Plan, he has standing to seek prospective relief, including the changes included in the "Prayer for Relief" below.

31.     As a result of Defendant's actions, the Plaintiff and class members are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### *Defendant is the Plan Administrator*

32.     Defendant is the "named fiduciary" to the Plan because it is the Plan administrator as that term is defined by ERISA. Defendant also exercised authority and discretionary control respecting the management of the Plan. Defendant is thus a statutory fiduciary to the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

*Additional Information on the Plan*

33. The Plan is a defined contribution salary deferral plan under Section 401(k) of the Internal Revenue Code ("IRC"). All persons employed by Defendant and its participating affiliates are eligible to participate in the Plan except those with collective bargaining rights, unless negotiated.

34. The Plan is subject to the provisions of ERISA.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):[1]

> All persons, except Defendant's fiduciaries and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 30, 2017, and the present (the "Class Period").

36. The members of the Class are so numerous that joinder of all members is impractical. According to the 2021 Form 5500 filed with the U.S. Department of Labor, there were 24,098 Plan participants with account balances, as of December 31, 2021.

37. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification, or subsequent pleadings in this action.

38. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A. Whether Defendant is a fiduciary of the Plan;

    B. Whether Defendant agreed to allow the Plan's recordkeeper to receive compensation via float from Plan assets;

    C. Whether Defendant was informed about the amount of compensation the Plan's recordkeeper received from float;

    D. Whether Defendant included in its negotiations with the Plan recordkeeper regarding the compensation the recordkeeper received from the Plan the compensation the recordkeeper was receiving via float;

    E. Whether Defendant monitored and tracked the amount of compensation the recordkeeper obtained from the Plan via float;

    F. Whether the Defendant disclosed to the Plan participants the amount of compensation the recordkeeper received from the Plan via float;

    G. Whether the Defendant disclosed any information about the amount of compensation the Plan's recordkeeper received via float;

    H. Whether Defendant failed to prudently ensure the Plan's compensation to the recordkeeper was being managed in compliance with ERISA;

    I. The proper form of equitable and injunctive relief; and

    J. The proper measure of relief.

39. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

40. This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41. In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANT'S FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES**

42. ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

43. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

44. As described above, Defendant was—and still is—a fiduciary of the Plan because:

    A. is so named; and/or

    B. exercised authority or control respecting management or disposition of the Plan's assets; and/or

    C. exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    D. had discretionary authority or discretionary responsibility in the administration of the Plan.

45. As a fiduciary, Defendant was/is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

46. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

47. During the Class Period, Defendant did not act prudently, nor in the best interests of the Plan's participants, because it caused Plan participants to pay excessive and unreasonable compensation to the Plan's recordkeepers.

48. During the Class Period Defendant failed to maintain and/or utilize a proper system of review in place to ensure that participants in the Plan were being charged appropriate and

reasonable fees and reasonable compensation to the Plan's recordkeepers. Additionally, Defendant failed to leverage the size of the Plan to negotiate the lowest fees for Participants. Defendant instead caused the Plan and its participants to pay excessive compensation to the Plan's recordkeepers.

49.  As set forth in detail below, Defendant breached its fiduciary duties to the Plan and its participants and beneficiaries and is therefore liable for breaching those duties under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

50.  "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

51.  "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

52.  Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is,

---

[2] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited November 8, 2022).

the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

53.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although 401(k) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

54.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must establish a prudent process for selecting service providers and ensuring that fees are reasonable. *See* "A Look at 401(k) Plan Fees," *supra*.

### *Defendant Failed to Monitor or Control the Plan's Recordkeeper's Compensation*

55.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

---

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited November 4, 2022).

56. Nearly all recordkeepers in the marketplace offer this range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

57. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

58. The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

59. Recordkeeping expenses can either be paid directly from plan assets, or indirectly by taking money from Plan participants' investments in a practice known as revenue sharing, or via float (or a combination of all three). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping services that the mutual fund company otherwise would have to provide.

60. Utilizing indirect payment methods is not *per se* imprudent. Plaintiff is not making a claim against Defendant merely because it used indirect methods to pay for recordkeeping.

61. However, when indirect payment methods are left unchecked, it can be devastating for Plan participants. Nobody sees the money change hands, and very few understand what the total compensation paid to the recordkeeper really is. It is a way to milk large sums of money out

of large plans by charging fees that never go down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is "'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[4]

62. Because indirect payments are asset based, they bear no relation to actual services provided, and bear no relation to a reasonable recordkeeping fee and can lead to excessive compensation. Again, it is important to emphasize that fees obtained through indirect payment methods, like float, are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or money moving into and out of the Plan. As the assets in the Plan increase, so too increases the recordkeeping compensation that a recordkeeper pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

63. It is well-established that plan fiduciaries have an obligation to monitor and control recordkeepers' compensation to ensure that such compensation remains reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee

---

[4] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited November 8, 2022).

collection, the fiduciary must understand the total amount paid to the recordkeeper and ensure that the compensation is reasonable. *See Tussey II*, 746 F.3d at 336.

64. Prudent fiduciaries implement two related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents from the recordkeeper that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

65. Second, prudent fiduciaries make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable compensation for the services provided to a plan, a prudent fiduciary must identify *all* sources of compensation, including direct compensation and indirect compensation being paid to the plan's recordkeeper. Prudent fiduciaries closely monitor the amount of compensation to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any compensation that exceeds a reasonable level be returned to the plan and its participants. To the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

66. Nowhere in Plaintiff's monthly statements, nor his quarterly statements, nor his annual statements, does Defendant bother disclosing how much compensation the Plan pays its recordkeepers via float. The information is also notably absent from the Plan's Summary Plan Description, annual Department of Labor 5500 disclosures, Plan participant statements, or any documents of which Plaintiff is aware.

67. The undisclosed, undocumented, and simply ignored indirect compensation that the Plan's recordkeepers receive from float equals millions of dollars of wasted Plan assets. To make matters worse, the Plan's assets have increased by nearly $1 billion during the Class Period. That means the recordkeepers' compensation via float has skyrocketed solely due to an increase in Plan assets, and the recordkeepers' compensation will continue to increase unless Defendant honors its fiduciary duties.

68. Defendant breached its fiduciary duty of prudence by permitting Empower and/or Alight Solutions to receive excessive compensation via float.

## FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

69. Plaintiff re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

70. As a fiduciary of the Plan, Defendant was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

71. Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the excessive compensation paid for recordkeeping services via float.

72. Defendant wasted Plan assets by failing to consider and include the compensation Defendant received from the plan via float.

73. Defendant's imprudence caused the Plan to lose millions of dollars during the Class Period.

74. Defendant's imprudence will continue to cause the Plan losses unless this case moves forward.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan, respectfully requests that the Court:

1. Find and declare that the Defendant has breached its fiduciary duties as described above;

2. Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6. Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7. Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

8. Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C.

§1132(g)(1) and the common fund doctrine;

    9.      Order the payment of interest to the extent it is allowed by law; and

    10.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 25th day of April, 2023.

Respectfully submitted,

By:    */s/ Chris R. Miltenberger*
      Chris R. Miltenberger
      Texas Bar Number: 14171200

**The Law Office of Chris R. Miltenberger, PLLC**

1360 N. White Chapel, Suite 200
Southlake, Texas 76092-4322
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

BRANDON J. HILL (pro hac vice forthcoming
Florida Bar Number: 37061
LUIS A. CABASSA (pro hac vice forthcoming)
Florida Bar Number: 0053643
AMANDA E. HEYSTEK (pro hac vice forthcoming)
Florida Bar Number: 0285020

**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

MICHAEL C. MCKAY (pro hac vice forthcoming)

**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law

**Attorneys for Plaintiff**