United States District Court
Southern District of Texas
**ENTERED**
February 10, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JESUS ESPINOZA,                    §
on behalf of the Baker             §
Hughes Company 401(k) Plan,        §
                                   §
       Plaintiff,                  §
                                   §
v.                                 §   Civil Action No. 23-1532
                                   §
BAKER HUGHES HOLDINGS, LLC.,       §
                                   §
       Defendant.                  §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jesus Espinoza, brings this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, representatively on behalf of the Baker Hughes Company 401(k) Plan (the "Plan"), against defendant, Baker Hughes Holdings, LLC, ("Defendant" or "Baker Hughes"), for breach of fiduciary duty of prudence by paying excessive and unreasonable compensation to the Plan's recordkeeper resulting in unreasonably high costs to Plan participants during a proposed Class Period beginning on April 30, 2017.[1]  Plaintiff seeks <u>inter alia</u> a declaration that Defendant breached its fiduciary duties, removal of individual fiduciaries who have breached their duties, an order adjudging Defendant liable to the Plan for losses resulting from each breach of fiduciary duty

---

[1]Class Action Complaint ("CAC"), Docket Entry No. 1, pp. 1-8 ¶¶ 1-35.  All page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

-1-

and requiring Defendant to restore the Plan to the position it would have occupied but for the breaches of fiduciary duties, and other appropriate relief including attorneys' fees and costs.[2]

Pending before the court are Plaintiff's Motion for Class Certification (Docket Entry No. 42), Defendant's Motion to Strike and Exclude Report of Al Otto ("Defendant's Motion to Strike") (Docket Entry No. 44), Plaintiff's Motion to Compel Defendant to Produce Additional Documents Responsive to Plaintiff's First Request for Production of Documents ("Plaintiff's Motion to Compel") (Docket Entry No. 48), Plaintiff's Motion to Compel Documents and Testimony that Have Been Wrongfully Withheld Based on Attorney Client Privilege (Docket Entry No. 49), Defendant's Motion for Summary Judgment ("Defendant's MSJ")(Docket Entry No. 53), and Defendant's Motion in Limine to Exclude Testimony of Al Otto ("Defendant's Motion to Exclude")(Docket Entry No. 54).

Also pending are Defendant's Brief in Opposition to Plaintiff's Motion for Class Certification ("Defendant's Opposition to Class Certification") (Docket Entry No. 43), Plaintiff's Reply in Support of Motion for Class Certification ("Plaintiff's Reply in Support of Class Certification") (Docket Entry No. 45), Plaintiff's Response in Opposition to Defendant's Motion to Strike and Exclude Expert Report of Al Otto ("Plaintiff's Opposition to Defendant's Motion to Strike") (Docket Entry No. 46), Defendant's Reply in

---

[2]Id. at 18-19 ("Prayer for Relief").

-2-

Support of Its Motion to Strike and Exclude Report of Al Otto ("Defendant's Reply in Support of Motion to Strike") (Docket Entry No. 47), Plaintiff's Response in Opposition to Defendant's Motion in Limine to Exclude Expert Testimony of Al Otto ("Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony")(Docket Entry No. 57), Plaintiff's Opposition to Motion for Summary Judgment ("Plaintiff's Opposition to Defendant's MSJ")(Docket Entry No. 58), Reply Memorandum in Support of Defendant's Motion in Limine to Exclude Testimony of Al Otto ("Defendant's Reply in Support of Motion to Exclude Otto Testimony")(Docket Entry No. 59), and Defendant's Reply in Support of Its Motion for Summary Judgment ("Defendant's Reply in Support of Its MSJ")(Docket Entry No. 60).

For the following reasons Defendant's Motion to Exclude the testimony of Al Otto submitted in support of Defendants' MSJ will be granted, Defendant's MSJ will be granted, and the remaining motions will be denied as moot.

## I. **Background**

### A. **Undisputed Facts**

The Plan is a qualified retirement plan commonly referred to as a 401(k) "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).[3]

---

[3]CAC, Docket Entry No. 1, pp. 5-6 ¶¶ 18, 20; Defendant's Answer to Plaintiff's Complaint ("Answer"), Docket Entry No. 29,
(continued...)

Defendant's eligible current and former employees participate in the Plan, which provides retirement income.[4]  As of December 31, 2021, the Plan had $3,815,191,486.00 in assets and 24,098 participants.[5]

Plaintiff is a former Plan participant.[6]  Defendant is the Plan administrator and Plan fiduciary pursuant to ERISA, 29 U.S.C. § 1002(21)(A)(i) and (iii).[7]  On January 1, 2020, Empower Retirement ("Empower") replaced Alight Solutions ("Alight") as the Plan's recordkeeper.[8]  Empower is affiliated with Great-West Trust Company ("Great-West").[9]

---

[3](...continued)
p. 3 ¶¶ 18, 20.

[4]CAC, Docket Entry No. 1, p. 6 ¶ 21; Defendant's MSJ, Docket Entry No. 53, p. 8 (acknowledging that the Plan is "a 401(k) defined contribution plan offered by defendant to help eligible participants save for retirement").

[5]CAC, Docket Entry No. 1, p. 2 ¶ 6; Answer, Docket Entry No. 29, p. 2 ¶ 6.

[6]The CAC alleges that "Plaintiff is a current participant in the Plan," Docket Entry No. 1, p. 6 ¶ 22, but Plaintiff's Reply in Support Class Certification, Docket Entry No. 45, pp. 14-15, acknowledges that he cashed out of the Plan in October of 2023.

[7]CAC, Docket Entry No. 1, p. 7 ¶ 32; Answer, Docket Entry No. 29, p. 5 ¶ 32.

[8]CAC, Docket Entry No. 1, p. 3 ¶ 6.  See also Plaintiff's Motion for Class Certification, Docket Entry No. 42, p. 11 n. 1 ("On January 1, 2020, Defendant caused the Plan to change its recordkeeper from Alight Solutions to Empower Retirement."); Defendant's Opposition to Class Certification, Docket Entry No. 43, p. 11 (acknowledging that Empower is the Plan's recordkeeper).

[9]See Defendant's Opposition to Class Certification, Docket
(continued...)

**B.   Legal Allegations**

Citing Federal Rule of Civil Procedure 23, Plaintiff alleges

that he

brings this action as a class action . . . on behalf of
himself and the following proposed class ('Class'):

All persons, except Defendant's fiduciaries
and their immediate family members, who were
participants in or beneficiaries of the Plan,
at any time between April 30, 2017, and the
present (the "Class Period").[10]

Asserting a single claim for breach of fiduciary duty of

prudence,[11] Plaintiff alleges that Defendant is a Plan fiduciary

subject to duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a),[12]

Defendant breached its fiduciary duties by "fail[ing] to monitor or

control the excessive compensation paid for record keeping services

via float,"[13] "Defendant wasted Plan assets by failing to consider

and include the compensation Defendant received from the [P]lan via

float,"[14] and "Defendant's imprudence caused the Plan to lose

---

[9](...continued)
Entry No. 43, p. 11 ("The recordkeeper, Empower, is a subsidiary of
Great West Trust Company[.]"); Plaintiff's Opposition to
Defendant's Motion to Exclude, Docket Entry No. 57, p. 11 ("Great-
West is an affiliate of Empower").

[10]CAC, Docket Entry No. 1, p. 8 ¶ 35.

[11]Id. at 17-18 ¶¶ 69-74.

[12]Id. at 17 ¶ 70.

[13]Id. ¶ 71.

[14]Id. ¶ 72.

millions of dollars during the Class Period."[15]  Plaintiff alleges
that

> Defendant agreed to compensate the Plan's recordkeeper by
> allowing the recordkeeper to receive compensation via
> "float" or Plan participant money.  "Float" is money in
> transit in or out of the Plan.  Defendant agreed that
> anytime Plan participants deposit or withdraw money from
> their individual accounts in the Plan, that money will
> first pass through the recordkeeper's clearing account.
> Plan participant money typically sits in the
> recordkeeper's clearing account or at least 2-3 days
> (often much longer).  Defendant has agreed any investment
> returns and/or interest earned on Plan participant money
> while it is in the recordkeeper's clearing account shall
> belong to the recordkeeper.  This is an <u>additional</u> form
> of compensation — indirect compensation — the
> recordkeeper received from the Plan.[16]

Defendant denies these allegations, but acknowledges that "float"
"refers to money in transit, such as the time in which funds leave
one account before entering another, and that . . . 'f]loat
compensation' or 'float income' is the money that might be earned
during the [time] . . . float money is in transit."[17]  While there
appears to be some ambiguity in the meaning of "float," in this
case the parties use the term "float" to mean money in transit, and
the terms "float income" or "float compensation" to mean money
earned on money in transit.  See Tussey v. ABB, Inc., 746 F.3d 327,

---

[15]Id. at 18 ¶ 73.  See also id. at 6 ¶ 23 ("[T]he Plan suffered
millions of dollars in losses caused by Defendant's fiduciary
breaches.").

[16]Id. at 3 ¶ 7.  See also Plaintiff's Opposition to Defendant's
Motion to Exclude, Docket Entry No. 57, pp. 7-8 (same).

[17]Defendant's Motion to Exclude, Docket Entry No. 54, p. 11.

332 & n. 4 (8th Cir.), <u>cert. denied</u>, 135 S. Ct. 477 (2014) (recognizing flexibility in the meaning of "float").

Plaintiff alleges that

his individual account in the Plan suffered losses because his Plan account was assessed an excessive amount for record keeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and prudently monitored and controlled fees to a reasonable level.[18]

Plaintiff alleges that he "has standing to bring this action on behalf of the Plan because he participates in the Plan and was injured by Defendant's unlawful conduct."[19]

## II. <u>Plaintiff's Motions to Compel</u>

Two motions to compel are pending: (1) Plaintiff's Motion to Compel Defendant to Produce Additional Documents Responsive to Plaintiff's First Request for Production of Documents (Docket Entry No. 48), filed on September 26, 2024, just days before the close of discovery on September 30, 2024; and Plaintiff's Motion to Compel Documents and Testimony that Has Been Wrongfully Withheld Based on Attorney Client Privilege (Docket Entry No. 49), filed on October 2, 2024. Defendant has since filed its MSJ (Docket Entry No. 53), and Plaintiff has filed a response in opposition. Defendant's MSJ states that "[i]n an apparently vain effort to resolve a discovery

---

[18]CAC, Docket Entry No. 1, p. 7 ¶ 29.

[19]<u>Id.</u> at 6 ¶ 26.

dispute, defendant produced another approximately 10,000 pages of additional discovery after the close of discovery."[20]   Because Plaintiff has acknowledged that on October 22, 2024, he received approximately 9,000 pages of documents,[21] and because Plaintiff has responded to Defendant's Motion to Exclude and Defendant's MSJ without arguing that any lack of discovery sought by its motions to compel have impeded its ability to respond, Plaintiff's motions to compel will be denied as moot.

### III. <u>Motions to Strike and to Exclude Otto Testimony</u>

Two motions to strike and exclude the testimony of Plaintiff's expert, Al Otto ("Otto"), are pending: (1) Defendant's Motion to Strike (Docket Entry No. 44), filed on August 2, 2024, together with Defendant's Opposition to Plaintiff's Motion for Class Certification (Docket Entry No. 43); and (2) Defendant's Motion to Exclude (Docket Entry No. 54), filed on October 30, 2024, together with Defendant's MSJ (Docket Entry No. 53).

### A.    Procedural Background

Plaintiff's expert, Otto, has authored two reports dated,

---

[20]Defendant's MSJ, Docket Entry No. 53, p. 8.   <u>See also</u> Defendant's Reply in Support of Its MSJ, Docket Entry No. 60, p. 6 (same).

[21]Plaintiff's Opposition to Defendant's Motion to Exclude, Otto Testimony, Docket Entry No. 57, pp. 5, 11, 15, and 26.

respectively, March 4, 2024 ("Otto's March Report"),[22] and July 29,
2024 ("Otto's July Report").[23]  Otto's March Report was prepared for
mediation that month and each page is clearly marked, "for
Mediation Only — Confidential FRCP 408."[24]  Nevertheless, Plaintiff
submitted Otto's March Report in support of his pending Motion for
Class Certification (Docket Entry No. 42), filed on July 15, 2024.[25]
Otto's March Report states, "[t]here has been very limited
discovery in this case to date.  I reserve the right to amend or
supplement any opinions . . . as more facts and information are
made available."[26]

---

[22]See Espinoza v. Baker Hughes Company 401(k) Plan Float
Compensation Analysis For Mediation Only — Confidential FRCP
408("Otto's March Report"), Exhibit 2 to Declaration of Michael
McKay in Support of Plaintiff's Motion for Class Certification,
Docket Entry No. 42-2, pp. 17-24.

[23]See Expert Report of Al Otto, Espinoza v. Baker Hughes
Company 401(k) Plan Float Compensation Analysis, Exhibit 2-B to
Declaration of Michael McKay in Support of Plaintiff's Opposition
to Defendant's MSJ, Docket Entry No. 58-5.  This report is also
filed as Exhibit 9 to Defendant's Motion to Strike, Docket Entry
No. 44-31, and Exhibit 2 to Plaintiff's Opposition to Defendant's
Motion to Exclude Otto Testimony, Docket Entry No. 57-3.

[24]Otto's March Report, Docket Entry No. 42-2, pp. 17-24.  See
also Order Granting Joint Motion to Stay Proceedings Pending
Mediation, Docket Entry No. 36, and Joint Report on Status of
Mediation Process, Docket Entry No. 37 (stating that an
unsuccessful mediation occurred on March 22, 2024).

[25]See Otto's March Report, Docket Entry No. 42-2, pp. 17-24.

[26]Id. at 1, Docket Entry No. 42-2, p. 17.

On August 2, 2024, Defendant filed its Motion to Strike Otto's March Report.[27]  Attached thereto is Otto's July Report, which Defendant states it received "[o]ver two weeks after [Plaintiff] mov[ed] for class certification based on the March 4 report."[28]  On October 30, 2024, Defendant filed both its MSJ (Docket Entry No. 53), and its Motion to Exclude Otto's testimony (Docket Entry No. 54).  Plaintiff relies on Otto's July Report to oppose Defendant's MSJ.[29]  As Defendant has observed

> [a]part from largely cosmetic changes, such as the addition of a cover page, statement of Otto's hourly rate, and inclusion of a curriculum vitae, the report is word-for-word the same as that prepared on March 4.  The sole addition of note was a listing of the documents defendant had produced in April, with a cover page stating that he had reviewed and considered all of them. [ECF 44-31, p. 19].  Not one document produced after March 4, however, is otherwise referenced in the revised report.[30]

Acknowledging that the arguments raised in both motions seeking to exclude Otto's reports and testimony "are for the most part the same or similar,"[31] Defendant explains that since filing its Motion

---

[27]Docket Entry No. 44, p. 6 (moving "to strike and exclude the report (and any related testimony) of Al Otto [ECF No. 42-2, pp. 17-24], filed by plaintiff in support of his motion for class certification [ECF No. 42]").

[28]Id. at 9.

[29]See e.g., Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, pp. 6, 8, 12, 15-16, 25, 28 (citing Otto's July Report, Docket Entry No. 58-5).

[30]Defendant's Motion to Exclude, Docket Entry No. 54, p. 9 (citing Docket Entry No. 44-31, p. 19).

[31]Id. at 6.

to Strike, Otto's deposition was taken on October 3, 2024, and it adds support for excluding his testimony.[32]

Like the arguments raised in both motions seeking to strike and exclude Otto's testimony, Plaintiff's arguments in opposition to each of those motions are virtually identical.[33] However, asserting that "a <u>Daubert</u> Motion filed on the dispositive motion deadline is not the time nor place to raise additional arguments in opposition to a Motion for Class Certification that has already been fully briefed,"[34] Plaintiff argues that "[u]nder the Local Rules, Defendant is not entitled to a third brief to support its Motion to Strike Mr. Otto's report filed in support of Plaintiff's Motion for Class Certification without leave of Court."[35]

Plaintiff's arguments fail to acknowledge that Defendant filed its second Otto-related motion, <u>i.e.</u>, its Motion to Exclude (Docket Entry No. 54), together with its MSJ (Docket Entry No. 53), and that the Motion to Exclude challenges all of Otto's testimony, not just his March Report, which Plaintiff submitted in support of his

---

[32]<u>Id.</u>  <u>See also</u> Remote Videotaped Deposition of Albert J. Otto ("Otto Deposition"), Exhibit 3 to Defendant's MSJ, Docket Entry No. 53-4; and Exhibit 3-1 to Defendant's Motion to Exclude, Docket Entry No. 54-4.

[33]<u>Compare</u> Plaintiff's Opposition to Defendant's Motion to Strike, Docket Entry No. 46, and Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57.

[34]Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 16.

[35]<u>Id.</u>

Motion for Class Certification.  This difference is significant because quoting Cone v. Vortens, Inc., No. 4:17-CV-00001-ALM-KPJ, 2019 WL 4451146, at *2 (E.D. Tex. September 17, 2019), Plaintiff argues that "at class certification, Daubert review is 'limited to [an expert] opinion's reliability and relevance to the requirements of class certification."[36]  Since, however, Defendant seeks to exclude Otto's testimony with respect to summary judgment, the grounds for exclusion are not so limited.  Because for the reasons stated below, Defendant's Motion to Exclude will be granted, Plaintiff's Motion for Class Certification, and Defendant's Motion to Strike Otto's report submitted in support thereof will be denied as moot.

**B.  Applicable Law**

Federal Rule of Evidence 702 provides that

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[36]Plaintiff's Opposition to Defendant's Motion to Strike, Docket Entry No. 46, p. 18.  See also Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 28 ("Given that the standard for measuring reliability at this stage is relatively low and grounds for exclusion is limited to an inquiry as to relevance to class certification requirements, Mr. Otto's testimony should not be excluded.").

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A district court must make a preliminary determination as to whether the requirements of Rule 702 are satisfied with respect to a particular expert's proposed testimony.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2796 (1993) (citing Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, . . . or evidence is admissible.")).  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167, 1176 (1999).  The party offering the expert's testimony bears the burden of proving by a preponderance of the evidence that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable.  Daubert, 113 S. Ct. at 2794-95.  See also Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002) ("[E]xpert testimony is admissible only if it is both relevant and reliable.").

-13-

To be qualified an expert "witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004), cert. denied, 126 S. Ct. 1022 (2006) (quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992)). To be relevant the reasoning or methodology underlying the expert's testimony must be applicable to the facts in issue. See Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir. 1999) (citing Daubert, 113 S. Ct. at 2799). To be reliable the reasoning or methodology underlying the expert's testimony must be scientifically valid. This does not mean that Rule 702 is limited to scientific opinions, but instead, is an inquiry into whether the methodology is a scientific or logical method that can be replicated and validated. Id. & n. 5 (citing Kumho, 119 S. Ct. at 1171 (holding that Rule 702 and the Daubert principles extend beyond scientific testimony)).

To clear the Daubert hurdle, expert testimony must be supported by "more than subjective belief or unsupported speculation." Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 388 (5th Cir. 2009) (quoting Daubert, 113 S. Ct. at 2795). "[E]xpert testimony must have a traceable, analytical basis in objective fact before it can be considered on summary judgment." Bragdon v. Abbott, 118 S. Ct. 2196, 2212 (1998). "[E]xpert testimony that relies on 'completely unsubstantiated factual

assertions' is inadmissible," Moore v. International Paint, L.L.C., 547 F. App'x 513, 515 (5th Cir. 2013) (per curiam) (quoting Hathaway v. Bazany, 507 F.3d 312, 319 & n. 4 (5th Cir. 2007)). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc), cert. denied, 119 S. Ct. 1454 (1999).  Moreover, "the expert's testimony must be reliable at each and every step or else it is inadmissible." Knight v. Kirby Inland Marine, Inc., 482 F.3d 347, 355 (5th Cir. 2007).  "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion." Id.  If "an expert's opinion is based on insufficient information, the analysis is unreliable." Paz, 555 F.3d at 388.

The decision to allow or exclude an expert from testifying lies in the sound discretion of the district court. St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 405 (5th Cir. 2000) (citing Moore, 151 F.3d at 274).  "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (2000 Advisory Committee Notes).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 113 S. Ct. at 2798.

The district court need not hold a hearing to resolve objections to an expert witness if the existing record is sufficient for the court to fulfill its gate-keeping role.  See Johnson v. Thibodaux City, 887 F.3d 726, 736 n. 11 (5th Cir. 2018); Carlson v. Bioremedi Therapeutic Systems, Inc., 822 F.3d 194, 201 (5th Cir. 2016).  Neither party argues that the record is insufficient for the court to fulfill its gate-keeping role without a hearing.

**C.  Application of the Law to Otto's Reports and Testimony**

Defendant does not challenge Otto's qualifications or the relevance of his testimony but, instead, argues that his testimony fails to satisfy Rule 702's reliability requirements because he relied on an invalid legal theory and an incomplete record, and he did not use reliable principles and methods to calculate loss.[37]

1.  Otto Relies on an Invalid Legal Theory

Defendant argues that both versions of Otto's report and his subsequent deposition testimony all rest on a  misapprehension of the law by a non-lawyer.  Defendant explains:

> The foundation of the report is a 2002 U.S. Department of Labor [("DOL")] Field Assistance ("FAB") bulletin, no. 2002-3 (Nov. 5, 2002).  [ECF 42-2, at pp. 20-24].  A field assistance bulletin, however, is not a regulation,

---

[37]Defendant's Motion to Exclude, Docket Entry No. 54, pp. 13-20.

-16-

and bulletin no. 2002-03 never went through the
procedures of the Administrative Procedures Act, 5 U.S.C.
§§ 1801 et seq.  Tellingly, the Department of Labor has
revised the regulations numerous times since 2002, e.g.,
Prohibited Transaction Exemption ("PTE") 2020-02
(compensation rules for investment advice fiduciaries),
75 F.R. 65263 (2010)(same), 75 F.R. 41600 (2010)
(disclosures regarding plan source controls), but has
never tried to incorporate this bulletin into the Code of
Federal Regulations.  Even if it had been incorporated
into the regulations (which it has not) under the Supreme
Court's recent decision in Loper Bright Enterprises v.
Raimondo, 144 S. Ct. 2244, 2247 (2024), any such
regulation would not be entitled to the former so-called
Chevron deference.  Cf. Chevron USA, Inc. v. National
Resources Defense Council, Inc., 467 U.S. 837
(1984)(expressly overruled by Loper Bright).[38]

Citing In re Fidelity ERISA Float Litigation, No. 13-10222-DJC,

2015 WL 1061497 (D. Mass. March 11, 2015), aff'd, 829 F.3d 55 (1st

Cir. 2016), and Tussey v. ABB, Inc., No. 2:06-CV-04305-NKL, 2012 WL

1113291, at *38 (W.D. Mo. March 31, 2012), amended in part, No. 06-

4305-CV-C-NKL, 2012 WL 2368471 (W.D. Mo. June 21, 2012), and aff'd

in part, vacated in part, rev'd in part, 746 F.3d 327 (8th Cir.

2014), Defendant argues that DOL FAB 2002-03 "has no legal force

here" because it provides guidance on how to avoid prohibited

transactions and is inapplicable to Plaintiff's claim for breach of

the duty of prudence.[39]

---

[38]Id. at 13.  DOL FAB 2002-03 appears in the record as Exhibit
3 to Declaration of Michael McKay in Support of Plaintiff's Motion
for Class Certification, Docket Entry No. 42-2, pp. 26-29.

[39]Id. at 14.  See also Defendant's Reply in Support of MSJ,
Docket Entry No. 60, p. 13.

Plaintiff contends that Defendant's "arguments are substantively meritless and procedurally improper,"[40] because Otto's opinions are not based on an 'incorrect legal theory,' (i.e., that float is a plan asset),"[41] and Otto's opinions closely track and support the allegations in his complaint.[42]    But Defendant's argument does not rest on whether float is a plan asset; Defendant's argument is that Otto's opinions are based on DOL FAB No. 2002-03, which Otto incorrectly opines imposes enforceable duties on plan fiduciaries.[43]    Plaintiff acknowledges that "[t]he foundation of Mr. Otto's opinion and reports are derived from a 2002 U.S. Department of Labor Field Assistance Bulleting ("FAB"), No. 2002-03."[44]    But as Defendant has cogently argued, DOL FAB 2002-03 has not been incorporated into the Code of Federal Regulations, and Plaintiff has failed to cite any authority holding that DOL FAB 2002-03 imposes duties on plan fiduciaries that support breach of

---

[40]Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 6.

[41]Id.

[42]Id. at 7-15.

[43]See Defendant's Motion to Exclude, Docket Entry No. 54, pp. 13-15 (arguing that both versions of Otto's report rely on DOL FAB No. 2002-03, Docket Entry No. 42-2, pp. 26-29).    See also Otto's July Report, pp. 4-5, Docket Entry No. 58-5, pp. 6-7 (citing DOL FAB 2002-03).

[44]Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 23.    See also Otto Deposition, p. 65:2-12, Docket Entry No. 53-4, p. 18 (testifying to his reliance on an opinion letter on float issued in 2002).

fiduciary duty claims.[45]   Moreover, even if DOL FAB 2002-03 did impose duties on plan fiduciaries, Otto's report and testimony with respect to those duties implicate questions of law.   Questions of law are the sole province of the court, not of expert witness reports and testimony.   The court may exclude expert testimony that proffers legal opinions or conclusions.   See Askanase v. Fatjo, 130 F.3d 657, 673 (5th Cir. 1997) (citing Specht v. Jensen, 853 F.2d 805, 807-09 (10th Cir. 1988), cert. denied, 109 S. Ct. 792 (1989)). Because Otto's reports and testimony opine about questions of law, they are inadmissible.

2.   Otto's Opinions Are Not Based on Sufficient Facts

Citing Paz, 555 F.3d at 383, Defendant argues that Otto's testimony should be excluded because it relies on an incomplete record.   Defendant argues that

> [a]s revealed in his deposition, Otto's claims that funds were not monitored or that float income went to the recordkeeper was not an affirmative assertion, but simply a reflection that absent some direction he had difficulty interpreting the various bank statements.   Otto's initial report was based on excerpts of documents voluntarily produced by Baker Hughes to promote settlement.   Otto was later sent the additional thousands of pages of bank records and, without Dan Webber's testimony, did not understand who owned what account and simply posited that money being deposited in an account at Northern Trust was money from the plan . . . being paid to Northern Trust . . .

---

[45]Defendant's Motion to Exclude, Docket Entry No. 54, p. 13. See also Defendant's MSJ, Docket Entry No. 53, pp. 18-19.

While Otto's later report states he reviewed deposition testimony before he wrote it, it turns out that was not true . . .[46]

Defendant argues that

[t]hese problems were exacerbated by plaintiff's own decision <u>not</u> to allow Otto to see the transcript of the May 9, 2024 deposition of Dan Webber, the person who managed the day-to-day operation of the plan.  Without Webber's careful and detailed explanation regarding the flow of funds, it is not surprising that Otto was unable to interpret some 6,000 pages of numerical data.[47]

Without disputing that Otto's testimony relies on an incomplete record, Plaintiff responds that "[t]he record was 'incomplete' because Defendant made it so.  The Court should not reward Defendant — and penalize Plaintiff — by excluding Otto's testimony based on the 'incomplete' record Defendant strategically created."[48]  Plaintiff explains that

**<u>after</u>** Plaintiff filed his first Motion to Compel, and **<u>after</u>** Defendant filed its Opposition to Plaintiff's Motion, and one day before Plaintiff's Reply, on October 22, 2024, Defendant abruptly produced over **9,000 pages** of bank account statements, clearing account statements, cash activity detail-related documents, and multiple Excel spreadsheets.  Most importantly for purposes of this Opposition, Plaintiff's expert, Al Otto, was denied access to these documents and thus could not opine on them.[49]

---

[46]Defendant's Motion to Exclude, Docket Entry No. 54, p. 15.

[47]<u>Id.</u>

[48]Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 16.

[49]<u>Id.</u> at 15.

Plaintiff's attempt to fault Defendant for Otto's reliance on an incomplete record is not persuasive. Both Otto's March and July reports state that "Defendant produced portions of U.S. Bank statements, but these documents raise more questions than they answer."[50] Plaintiff does not dispute that in April of 2024, following the parties' unsuccessful mediation, Defendant produced 6,000 of pages of bank records.[51] Defendant's production of these pages is corroborated by the major difference between Otto's March and July reports, i.e., a listing of over 6,000 pages of documents and a cover page stating that Otto had reviewed and considered all of them present in the July report but missing from the March report.[52] Yet, despite Otto's statement that he had reviewed all of these pages, his March and July reports are almost word-for-word the same. Moreover, if after receiving the 6,000 pages of bank records in April of 2024, additional records were still needed, Plaintiff does not explain why he waited until September 26, 2024, only four days before the discovery deadline of September 30, 2024, to file his first Motion to Compel (Docket Entry No. 48), seeking

---

[50]Otto's March Report, p. 7, Docket Entry No. 42-2, p. 23; Otto's July Report, p. 7, Docket Entry No. 58-5, p. 9.

[51]See e.g., Plaintiff's Opposition to Defendant's Motion to Strike, Docket Entry No. 46, p. 24 (acknowledging that "Defendant produced 6,000 pages of documents in this case, all of which were made available to and reviewed by Mr. Al Otto").

[52]Index of Documents attached to Otto's July Report, Docket Entry No. 58-5, pp. 19-43.

"the entire documents of partial documents already produced."[53]

Otto's July 2024 Report states that "[m]y opinions are based on my review of the documents provided in this case, **deposition testimony**, and my professional experience and training in the industry."[54]   But Otto testified at his deposition that before writing his reports he had not reviewed any deposition testimony, and that since then he had reviewed the deposition testimony of only one person, the Plan's Chief Human Resources Officer.[55] Moreover, despite Plaintiff's assertion that "Otto had access to the deposition transcript of Defendant's corporate representative (including exhibits),"[56] Otto testified that he had not reviewed the deposition testimony of Defendant's corporate representative, Dan Webber, the Plan's Manager.[57]   Although Webber's deposition was taken on May 9, 2024, well before the date of either Otto's July Report (July 29, 2024) or Otto's deposition (October 3, 2024),

---

[53]Plaintiff's Motion to Compel, Docket Entry No. 48, p. 7.

[54]Otto's July Report, p. 2, Docket Entry No. 58-5, p. 4 (emphasis added).  See also Plaintiff's Opposition to Defendant's Motion to Strike, Docket Entry No. 46, p. 24 (asserting that "Otto had access to the deposition transcript of Defendant's corporate representative (including exhibits)").

[55]Otto Deposition, pp. 21:25-22:16, Docket Entry No. 53-4, p. 7.

[56]Plaintiff's Opposition to Defendant's Motion to Strike, Docket Entry No. 46, p. 24.

[57]Otto Deposition, pp. 22:17-19, 62:5-12, Docket Entry No. 53-4, pp. 7, 17.

-22-

Plaintiff neither explains why Otto failed to review Webber's deposition, nor disputes Defendant's argument that absent review of Webber's deposition "it is not surprising that Otto was unable to interpret [thousands of] pages of numerical data."[58]

Otto opines that "Defendant allowed both Great West and Northern Trust the ability to earn float compensation,"[59] and that "any and all of the float compensation is unreasonable and should be returned to the Plan."[60]  Otto based these opinions on assertions that "[f]loat earnings are an element of a trustee's compensation,"[61] that "Defendant executed a contract with Great-West Trust Company ('Great-West') that provides Great-West is to establish a 'Sweep Account' for assets in the Plan pending investment and withdrawal,"[62] and that "[t]he Northern Trust Master Agreement indicates that Northern Trust was allowed to invest money in transit to and from individual accounts."[63]  But Otto's deposition testimony shows that he merely assumed that Great West and Northern Trust were retaining float compensation and that any float compensation they were retaining was unreasonable because he

_____

[58]Defendant's Motion to Exclude, Docket Entry No. 54, p. 15.

[59]Otto's July Report, p. 7, Docket Entry No. 58-5, p. 9.

[60]Id.

[61]Id. at 4, Docket Entry No. 58-5, p. 6.

[62]Id. at 6, Docket Entry No. 58-5, p. 8.

[63]Id. at 7, Docket Entry No. 58-5, p. 9.

lacked sufficient information to determine how float compensation was tracked, that Great West or Northern Trust were, in fact, retaining float compensation or, if so, how much. Moreover, despite stating in his report that "[t]o understand reasonableness, one needs to include both direct and indirect payments,"[64] and that "[w]ithout calculating . . . the actual float interest earned by a trustee, it is not possible . . . to determine if compensation to a directed trustee is reasonable,"[65] due to an alleged lack of information provided by Defendant, Otto was only able to estimate the amount of float compensation/plan loss based on assumptions that are not fully disclosed.[66]

For example, when asked if after reviewing the documents he "gain[ed] any understanding of how float was tracked by this plan,"[67] he responded

> [n]ot really. No. . . . It was an extreme curiosity to me how it was tracked . . .
>
> You have a complicating factor here in that this is a master trust. So Northern Trust was also involved in this. And I did not have enough data to come to a conclusion about who had what money when.[68]

---

[64]Id. at 5, Docket Entry No. 58-5, p. 7.

[65]Id. at 6, Docket Entry No. 58-5, p. 8.

[66]Id. at 8, Docket Entry No. 58-5, p. 10.  See § III.C.3, below, for discussion of Otto's assumptions.

[67]Otto Deposition, p. 33: 13-15, Docket Entry No. 53-4, p. 10.

[68]Id. at 33:16-25, Docket Entry No. 53-4, p. 10.  See also id. at 51:4-54:7, Docket Entry No. 53-4, pp. 14-15 (acknowledging that
(continued...)

When asked if he knew "what the Northern Trust expense account was,"[69] Otto answered, "So I know that there is an expense account at Northern Trust.  What I don't know is if the expense account is inside the plan or at Northern Trust.  And so that's a . . . question for me."[70]  When asked why that was a question for him, Otto said

> [w]ell, the — ownership of those moneys, if it's at — if it's in a Northern Trust account at Northern Trust it's their money.  And the question is are they getting money from the plan and — and then potentially disbursing it or is this — are they managing an account inside the plan. I don't know the answer to that.  Those are really the — the two key elements of tracking . . . fees.[71]

When asked if "the fact [that money] was not being paid directly to Northern Trust, but rather deposited in an account at Northern Trust . . . would make a difference,"[72] Otto said, "Well, it's information that — that I would want to know, yes."[73]  And when asked, "do you know the answer to that question," he said, "I do not."[74]  When asked if he had "the opportunity to review documents

---

[68] (...continued)
he could see the same amounts of money being transferred between accounts, but that he could not tell who was making what or how much, and that the answers to those questions could change his conclusions).

[69] Id. at 35:25-36:1, Docket Entry No. 53-4, p. 10.

[70] Id. at 36:2-6, Docket Entry No. 53-4, p. 10.

[71] Id. at 36:7-18, Docket Entry No. 53-4, p. 10.

[72] Id. at 36:19-22, Docket Entry No. 53-4, p. 10.

[73] Id. at 36:23-24, Docket Entry No. 53-4, p. 10.

[74] Id. at 36:25-37:2, Docket Entry No. 53-4, pp. 10-11.

. . . that provide[] . . . a level of certainty pertaining to how much float compensation the recordkeeper received in this matter,"[75] Otto replied

> [n]ot really, no.  I mean, it — it's — it's an unknown, and I mentioned it earlier, there's just multiple accounts where float could be earned, first, for example, at Northern Trust and Empower.  And so it was not clear to me . . . what all the float interest was . . . And I do know that that's imperative in determining if fees are reasonable.[76]

These excerpts from Otto's deposition show that the key opinions expressed in his reports, i.e., that "Defendant allowed both Great West and Northern Trust the ability to earn float compensation," and that "any and all of the float compensation is unreasonable and should be returned to the plan,"[77] are not based on sufficient facts and data but, instead, are based on subjective belief and unsupported speculation that the Plan's recordkeepers were retaining float compensation and that any such compensation was unreasonable.

3.   Otto's Testimony is Not Based on Reliable Principles and Methods Applied to the Facts of this Case

Defendant argues that "Otto's report also fails the requirements of Rule 702(c) and (d) in that it not only fails to

---

[75]Id. at 60:6-10, Docket Entry No. 53-4, p. 16.

[76]Id. at 60:11-20, Docket Entry No. 53-4, p. 16.

[77]Otto's July Report, p. 7, Docket Entry No. 58-5, p. 9.

apply reliable principles and methods, but also fails to apply any such principles and methods in a reliable way."[78]  Asserting that Otto's report claims losses to the Plan, but sets forth no more than guesses as to what those losses might have been,[79] Defendant argues that Otto's report evidences "no methodology at all."[80]

Without identifying any principles or methods in Otto's report, Plaintiff responds that "Otto provided a reliable application of reliable principles and methods to form the basis of his opinion that easily meet <u>Daubert</u> and rule 702."[81]  Plaintiff argues that

> Defendant is contesting the basis of Mr. Al Otto's opinions in that it contests the assumptions underlying his findings (as well as the sources of his opinions, <u>i.e.</u>, the DOL bulletin).  But such issues go to the **weight** of and **not admissibility** of Mr. Otto's opinions. This Honorable Court should deny Defendant's Motion. Alternatively, and at an absolute minimum, the Court should wait to resolve Defendant's Motion . . . at trial.[82]

Regarding the amount of unreasonable float compensation, Otto states that

---

[78]Defendant's Motion to Exclude, Docket Entry No. 54, p. 18.

[79]<u>Id.</u> at 20.

[80]<u>Id.</u> at 19.

[81]Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 16.

[82]<u>Id.</u> at 16-17.  <u>See also</u> <u>id.</u> at 28-29 (same).

[t]he civil complaint in this case was filed on April 25,
2023.   ERISA has a six-year statute of limitations.
During the limitation period, the annual contributions
ranged from $1.1 million to $3.4 million, and
distributions ranged from $4.1 million to $9.4 million
based on 5500s.   Float compensation can be estimated
based on five days of float for distributions and two
days for contributions.  During the limitation period
the daily average cash in the Plan was approximately $8.8
million.   These numbers were derived from the Plan's
Annual 5500 Disclosures and are substantiated by the
Great West Custodial Statements.

Defendant has not provided any information that
confirms or calculates the actual amount of float
compensation received by Great West or Northern Trust. .
. . I have used the following assumptions to calculate
what was likely earned by Great West (and or Northern
Trust) during the relevant time period.   These are
present valued as of approximately October 11, 2023.  The
numbers are conservative as they do not account for the
last six months of losses and the 2 and 5 day assumptions
are skewed in Defendant's favor too.

| Comparator | Return | Float Compensation/Plan Losses |
|------------|--------|--------------------------------|
| FA MM Class Y | 0.85% | $448,739 |
| FA MM Class Z | 1.11% | $586,000 |
| Plan Return | 5.30% | $3,480,826 |
| Stable Value Fund | 2.00% | $1,212,545 |
| FF + 125 | 2.48% | $1,520,943 |
| S&P 500 | 11.37% | $7,843,878 |
| GWLC | 6.00% | $3,888,644 |
| GWLC | 3.00% | $1,762,196[.][83] |

---

[83]Otto's July Report, pp. 7-8, Docket Entry No. 58-5, pp. 9-10.
See also Otto's March Report, pp. 7-8, Docket Entry No. 42-2,
pp. 23-24 (same).

Otto's report candidly admits that he lacked sufficient information to calculate an actual amount of float compensation received by Great West or Northern Trust, and that because he lacked that information, he used assumptions to calculate what was likely earned by Great West and/or Northern Trust during the relevant time period, and opined that those amounts were unreasonable. Despite the undisputed facts that Empower, Great West's affiliate, became the Plan's recordkeeper in January of 2020, and that before then the Plan's recordkeeper was Alight, Otto's report neither acknowledges Alight's period as recordkeeper, nor addresses how the amount of float compensation and/or plan losses during Alight's time as recordkeeper factor into the figures he presents as Float Compensation/Plan Losses.

While Otto identified some of the assumptions he relied upon for reaching the numbers he reported under the heading Float Compensation/Plan Losses, i.e., that float compensation could be estimated based on five days of float for distributions and two days for contributions, and on the daily average cash in the Plan, his report does not explain why reliance on these assumptions is reasonable. Moreover, neither Otto's report nor his deposition testimony identify principles or methods that he used for choosing "comparators" or their rates of return, or for determining that the comparators chosen represent reasonable investment vehicles for float. The comparators, too, appear to represent no more than unsubstantiated assumptions.

For example, when asked how he chose the comparators, identified their rates of return, and determined that they were reasonable investment vehicles for float, Otto testified that float should be invested where the principal has a "high degree of safety," such as a stable value fund, a general account fund, or a short term investment fund.[84]   But when asked specifically about individual comparators, he testified that the stable value fund was the only fund of its type in his list of comparators,[85] that the S&P 500 appears in his list as "purely an indicator,"[86] and that due to volatility of the S&P 500, an S&P 500 index fund would not be an appropriate investment vehicle for float.[87]   Otto testified that he could not remember what the FF + 125 was,[88] and when asked about the difference between the two GWLCs listed, he testified that the rate of return indicated for one of them was merely "what I know is often offered."[89]   Otto's deposition testimony shows that the estimates for the amount of Unreasonable Float Compensation/Plan

---

[84]Otto Deposition, pp. 42:4-24, Docket Entry No. 53-4, p. 12.

[85]Id. at 43:13-17, Docket Entry No. 53-4, p. 12.

[86]Id. at 40:21, Docket Entry No. 53-4, p. 11.

[87]Id. at 41:23-42:3, Docket Entry No. 53-4, p. 12.  See also id. at 40:18-21, Docket Entry No. 53-4, p. 11 (stating that none of the mega plans he's worked with invest float in the S&P 500 and he cited it only as an "indicator").

[88]Id. at 43:5-12, Docket Entry No. 53-4, p. 12.

[89]Id. at 43:18-44:2, Docket Entry No. 53-4, p. 12.

Loss shown in his report are unreliable both because they lack a
"traceable, analytical basis in objective fact," Bragdon, 118
S. Ct. at 2212, and because Otto has neither identified the
principles and methods that he used to estimate those amounts, nor
cited evidence that the principles and methods he used are
considered reliable in the field in which he works.

Plaintiff argues that the court should, nevertheless, deny
Defendant's Motion to Exclude because Defendant's arguments
regarding Otto's failure to use reliable principles and methods to
reach his conclusions go to the weight and not the admissibility of
his opinions.[90]  But

> nothing in either Daubert or the Federal Rules of
> Evidence requires a district court to admit opinion
> evidence that is connected to existing data only by the
> ipse dixit of the expert.  A court may conclude that
> there is simply too great an analytical gap between the
> data and the opinion offered.

General Electric Co. v. Joiner, 118 S. Ct. 512, 519 (1997).  Here,
Otto's failure to show that his estimates of Unreasonable Float
Compensation/Plan Loss have a traceable, analytical basis in
objective fact, and his failure to disclose the principles and
methods that he applied to the facts of this case creates an
analytical gap between the summary judgment evidence and Otto's
opinions regarding the likely amounts of float compensation/plan
losses that is simply too great.

---

[90]Plaintiff's Opposition to Defendant's Motion to Exclude Otto
Testimony, Docket Entry No. 57, pp. 16-17, 28-29.

**D.   Conclusions**

Because Plaintiff has failed to carry his burden of showing that Otto's reports and testimony are based on a valid legal theory, sufficient facts and data, or reliable principals and methods applied to the facts of this case, the court concludes that Plaintiff has failed to establish that Otto's testimony is admissible under Federal Rule of Evidence 702, or that it satisfies the requirements for expert testimony articulated in Daubert, 113 S. Ct. at 2786.  For these reasons, Defendant's Motion to Exclude Otto's Testimony, Docket Entry No. 54, will be granted.


**IV.  Defendant's Motion for Summary Judgment**

Plaintiff alleges that Defendant breached its fiduciary duty of prudence by "fail[ing] to monitor or control the excessive compensation paid for record keeping services via float,"[91] that "Defendant wasted Plan assets by failing to consider and include the compensation Defendant received from the [P]lan via float,"[92] and that "Defendant's imprudence caused the Plan to lose millions of dollars during the Class Period."[93]  Citing DOL FAB 2002-03,

---

[91]CAC, Docket Entry No. 1, p. 17 ¶ 71.  See also id. at p. 3 ¶ 7 (alleging that "Defendant agreed to compensate the Plan's recordkeeper by allowing the recordkeeper to receive compensation via 'float' on Plan participant money" as an additional form of compensation, i.e., "indirect compensation from the Plan").

[92]Id. ¶ 72.

[93]Id. at 18 ¶ 73.  See also id. at 6 ¶ 23 ("[T]he Plan suffered
(continued...)

Plaintiff argues that

> the DOL has mandated that fiduciaries (like Defendant
> here) must negotiate, monitor, and factor into the
> recordkeeper's total compensation the float earnings that
> a recordkeeper pockets. . . The DOL's position on float
> is consistent with common sense and ERISA, which requires
> plan fiduciaries to prudently defray plan expenses.  See
> 29 U.S.C. § 1104(a)(1)(A)(ii).  In sum, prudent
> fiduciaries monitor float compensation and include the
> float compensation when monitoring and negotiating the
> total amount of compensation recordkeepers receive from
> retirement plans.  Defendant failed to do so.[94]

Defendant moves for summary judgment on three independent
grounds:

> First, there is no claim for the conduct alleged, as
> float is not a plan asset under ERISA thus its treatment
> triggers no fiduciary duty. . . Second, as a factual
> matter, float is not being paid to the recordkeeper as
> "additional consideration," but rather is being used to
> defray . . . Plan expenses . . . Third, [P]laintiff
> neither alleges nor can prove that the expenses being
> paid to the recordkeeper are excessive.[95]

## A.    Standard of Review

Summary judgment is authorized if the movant establishes that
there is no genuine dispute about any material fact and the law
entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about
material facts are "genuine" if the evidence is such that a

---

[93](...continued)
millions of dollars in losses caused by Defendant's fiduciary
breaches.").

[94]Plaintiff's Opposition to Defendant's MSJ, Docket Entry
No. 58, p. 7.  See also CAC, Docket Entry No. 1, pp. 3-4 ¶¶ 9-11
(alleging that Defendant failed to follow DOL float mandates).

[95]Defendant's MSJ, Docket Entry No. 53, p. 7.

reasonable jury could return a verdict for the nonmoving party.
Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).
"Only disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude summary judgment."
Id.  The Supreme Court has interpreted the plain language of Rule
56 to mandate "the entry of summary judgment after adequate time
for discovery and upon motion, against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  Celotex Corp. v. Catrett, 106
S. Ct. 2548, 2552 (1986).  A party moving for summary judgment
"must 'demonstrate the absence of a genuine issue of material
fact,' but need not negate the elements of the nonmovant's case."
Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)
(en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553).  If
the moving party meets this burden, "the nonmovant must go beyond
the pleadings and designate specific facts showing that there is a
genuine issue for trial."  Id.  Factual controversies are to be
resolved in favor of the nonmovant, "but only when . . . both
parties have submitted evidence of contradictory facts."  Id.
"[T]he court must draw all reasonable inferences in favor of the
nonmoving party, and it may not make credibility determinations or
weigh the evidence."  Reeves v. Sanderson Plumbing Products, Inc.,
120 S. Ct. 2097, 2110 (2000).

**B.    Applicable Law**

The primary purpose of ERISA is to protect participants and beneficiaries of employee benefit plans.  See Pilot Life Insurance Co. v. Dedeaux, 107 S. Ct. 1549, 1551 (1987) (citing 29 U.S.C. § 1001(b)).  One way that ERISA achieves this purpose is by imposing duties on plan fiduciaries.  See 29 U.S.C. § 1104(a)(1). One of the duties imposed on plan fiduciaries is the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This duty is commonly referred to as the duty of prudence.  Observing that "an ERISA fiduciary's duty is 'derived from the common law of trusts,'" the Supreme Court has held that "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."  Tibble v. Edison International, 135 S. Ct. 1823, 1828 (2015).  The Supreme Court has observed that under trust law, a trustee has a continuing duty to monitor the prudence of investment options, including record keeping fees, in order to be cost-conscious in administering their duties.  See id. at 1828-29.  See also Pizarro v. Home Depot, Inc., 634 F. Supp. 3d 1260, 1285 (N.D. Ga. 2022), aff'd, 111 F.4th 1165 (11th Cir. 2024), pet. for cert. docketed December 6, 2024 ("Fiduciaries must prudently select third-party service providers,

. . . and can be subject to liability if they do not reasonably monitor the fees charged and the fees are excessive."). "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will be context specific." Hughes v. Northwestern University, 142 S. Ct. 737, 742 (2022).

To establish an ERISA claim for breach of the fiduciary duty or prudence, Plaintiff bears the burden of proving that the Plan is governed by ERISA, that defendant is a Plan fiduciary, and that Defendant breached its duty of prudence causing a loss to the Plan. See Schweitzer v. Investment Committee of Phillips 66 Savings Plan, 960 F.3d 190, 195 (5th Cir. 2020), cert. denied, 142 S. Ct. 706 (2021). There is no dispute that the Plan is governed by ERISA, or that Defendant is a Plan fiduciary.[96]  Defendant's MSJ is focused on the sufficiency of the other elements of Plaintiff's claim, i.e., that Defendant breached its duty of prudence causing a loss to the Plan. In this circuit, an ERISA plaintiff bears the burden of "prov[ing] a breach of a fiduciary duty and a prima facie case of loss to the plan." McDonald v. Provident Indemnity Life Insurance Co., 60 F.3d 234, 237 (5th Cir. 1995), cert. denied, 116 S. Ct. 1267 (1996). Once a plaintiff has met this burden, the defendant can defeat liability by establishing "that the loss was not caused by . . . the breach of duty." Id.

---

[96]See CAC, Docket Entry No. 1, pp. 5-6 ¶¶ 18-20, and 7 ¶ 32; Answer, Docket Entry No. 29, pp. 3 ¶¶ 18-20, and 5 ¶ 32.

**C.   Application of the Law to the Undisputed Facts**

Defendant argues that Plaintiff's "claim first perishes as a matter of law because float is not a plan asset and no duty is owed to its treatment."[97]  Defendant also argues that even if a duty is owed to treatment of float, Plaintiff cannot cite evidence capable of establishing that duty was breached, or that any breach caused loss to the Plan.

**1.   Plaintiff Fails to Cite Evidence Capable of Establishing Defendant Owes a Fiduciary Duty to Its Treatment of Float**

Asserting that "float is not a plan asset and[, therefore, that] no duty is owed to its treatment,"[98] Defendant argues that Plaintiff's claim is not cognizable because absent a fiduciary duty there can be no breach of fiduciary duty.[99]  In support of this argument, Defendant cites <u>Tussey</u>, 746 F.3d at 339-40, and <u>In re Fidelity ERISA Float Litigation</u>, 829 F.3d at 59-62, two cases in which courts dismissed breach of fiduciary claims asserted against ERISA plan fiduciaries for alleged misuse of float income upon finding that under the facts of those cases, float was not a plan asset.[100]  Defendant also cites <u>Harmon v. Shell Oil Co.</u>, No. 3:20-CV-00021, 2021 WL 1232694, at *2-*3 (S.D. Tex. March 30, 2021), for

---

[97]Defendant's MSJ, Docket Entry No. 53, p. 14.

[98]<u>Id.</u>

[99]<u>Id.</u> at 14-19.

[100]<u>Id.</u> at 15.

dismissing a breach of fiduciary duty claim for alleged misuse of plan participant data upon finding that data was not a plan asset.[101]

Plaintiff responds that he has neither alleged nor argued that float is a Plan asset.[102]   But missing from Plaintiff's briefing is any discussion of why, if float is not a Plan asset, Defendant owes a fiduciary duty to Plan participants for its treatment.   Instead, Plaintiff argues that

> [i]n acting prudently, an ERISA fiduciary's conduct must give appropriate consideration to those facts and circumstances that the fiduciary knows or should know are relevant to the administration of the Plan.   29 C.F.R. § 2550.404a-1(b)(1)(i).   One such factor is defraying reasonable Plan expenses, 29 C.F.R. § 2550.404a-1(d)(1). . . To survive summary judgment, Plaintiff must provide evidence from which a factfinder could conclude that Defendant breached its duty of prudence.   Here the summary judgment record makes clear that a factfinder could find Defendant breached its duty of prudence by failing to consider the millions of dollars in float income that **the recordkeeper was pocketing from the Plan** during the relevant time period.   This is exactly what the DOL said a prudent fiduciary should do. . . A prudent fiduciary charged with defraying Plan expenses for a Plan with $4 billion in assets would go to the Plan's recordkeeper who, according to Defendant is charging Plan participants $34 per year to be in the Plan, or a total of nearly $1 million a year for all Plan participants and request the recordkeeper to eliminate or offset the $34 per participant, per year direct charge because of the indirect float compensation being collected by the

---

[101]Id.

[102]See Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 6 ("Plaintiff again confirms that he does not allege that 'float' is a plan asset."); Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, p. 18 ("Plaintiff's Claim Does Not Hinge on Float Being a Plan Asset").

> recordkeeper.    Defendant  did  not  do  that  here.
> Defendant's  failure  cost  the  Plan  millions  in  losses.
> These  fiduciary  failures  have  nothing  to  do  with  whether
> float  is  a  plan  asset.[103]

Quoting <u>Pizarro</u>, 634 F. Supp. 3d at 1285, Plaintiff argues that "[f]iduciaries . . . can be subject to liability if they do not reasonably monitor the fees charged and the fees are excessive."[104] Plaintiff also attempts to distinguish the cases that Defendant cites in support of its argument that Plaintiff's claim for alleged misuse of float income is not cognizable under ERISA because float is not a Plan asset.

Plaintiff's reference to "what the DOL said a prudent fiduciary should do,"[105] is clearly a reference to DOL FAB 2002-03, which Plaintiff argues "describes what retirement plan sponsors **must** do to satisfy ERISA's fiduciary duty of prudence when providing recordkeepers with indirect compensation via float."[106] But as Defendant has cogently argued, DOL FAB 2002-03 has not been incorporated into the Code of Federal Regulations and, therefore, does not have the force of law, and Plaintiff has failed to cite any authority holding that DOL FAB 2002-03 imposes duties on plan administrators that support claims for breach of fiduciary duty.[107]

---

[103]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, pp. 18-19 (emphasis added).

[104]<u>Id.</u> at 24.

[105]<u>Id.</u> at 18.

[106]<u>Id.</u> at 15 (emphasis added).

[107]Defendant's MSJ, Docket Entry No. 53, pp. 18-19.  <u>See also</u> Defendant's Motion to Exclude, Docket Entry No. 54, p. 13.

Moreover, even if DOL FAB 2002-03 did impose duties on plan administrators, it is inapplicable to the facts of this case because it assumes plan asset status of float, _i.e._, the funds that are the source the float income. Plaintiff concedes that the float at issue in this case is not a Plan asset. See In re Fidelity Float ERISA Float Litigation, 2015 WL 1061497, at *7 (observing that this "DOL guidance assumes that plan assets have been transferred into the trust accounts and that the plan assets are the source of the float income"). Because Plaintiff has failed to cite any authority holding that plan administrators owe fiduciary duties to assets that are not plan assets, and Plaintiff argues that his claim does not depend on float being a Plan asset, Plaintiff has failed to cite law or evidence capable of establishing that Defendant owes a fiduciary duty to its treatment of float. Plaintiff's contention that the opinions in Tussey, In re Fidelity ERISA Float Litigation, or Harmon require a different conclusion rests on mischaracterization of those cases.

In Tussey the plaintiffs sued the plan sponsor (ABB, Inc.) and the plan's recordkeeper (Fidelity), alleging that they were liable for plan losses stemming from excessive compensation that Fidelity received from the plan. Plaintiffs alleged that Fidelity received both direct compensation in the form of fees paid by plan participants and indirect compensation in the form of revenue sharing and float income. Following a four-week trial, the

-40-

district court held, in relevant part, that

> (1) ABB Defendants violated their fiduciary duties to the Plan when they failed to monitor record keeping costs, . . . . (2) ABB, Inc., and the Employee Benefits Committee violated their fiduciary duties to the Plan when they agreed to pay to Fidelity an amount that exceeded market costs for Plan services in order to subsidize the corporate services provided to ABB by Fidelity, such as ABB's payroll and record keeping for ABB's health and welfare plan and its defined benefit plan; (3) Fidelity Trust breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan; and (4) Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan.

Tussey, 2012 WL 1113291, at *2. However, the Eighth Circuit reversed the district court's ruling relating to float because "the [plan] participants failed to adduce any evidence the Plan had any property rights in the float or float income." Tussey, 746 F.3d at 339. The court explained that "[a]bsent proof of any ownership rights to the [float] funds . . . , the Plan had no right to float income from [those funds]." Id. at 340.

Plaintiff attempts to distinguish Tussey by arguing that the Eighth Circuit's reversal of the district court's float-related holdings are inapposite because they involve claims for breach of the fiduciary duty of loyalty asserted against the plan's recordkeeper, who has not been sued in this case. Without providing any citation, Plaintiff argues that the Eighth Circuit dismissed all claims against the plan's recordkeeper, Fidelity, "on grounds that Fidelity was not an ERISA fiduciary to the ABB plan. . . . [and] had no duty to ensure that [its] compensation received

-41-

from the ABB plan was reasonable."[108]  But the Eighth Circuit did

not find that Fidelity was not an ERISA fiduciary with respect to

float.  To the contrary, the Eighth Circuit held that

> [b]ecause the participants have failed to show the float
> was a Plan asset under the circumstances of this case,
> the district court erred in finding Fidelity breached its
> fiduciary duty of loyalty by paying the expenses on the
> float accounts and distributing the remaining float to
> the investment options.

Id. at 340.

Plaintiff also argues — again without providing any citation

— that Tussey is distinguishable because the Eighth Circuit

affirmed the district court's finding that the plan's sponsor, ABB,

Inc., and the Employee Benefits Committee violated their fiduciary

duties by causing the plan to pay excessive compensation to the

plan's recordkeeper, including via float.[109]  But the Eighth Circuit

opinion upholding the district court's finding that the ABB

defendants violated their fiduciary duties by failing to monitor

record keeping costs and paying the recordkeeper excessive amounts

does not mention float.  To the contrary, the claim that the Eighth

Circuit upheld is based on allegations that the ABB defendants

"breached their fiduciary duties by failing to monitor and control

record keeping fees and for **paying excessive revenue sharing from**

**Plan assets** to subsidize ABB's other corporate services."  Id. at

---

[108]Plaintiff's Opposition to Defendant's MSJ, Docket Entry
No. 58, p. 19.

[109]Id. at 19-20.

336 (emphasis added).  Moreover, the district court's finding that the ABB defendants breached their fiduciary duties with respect to record keeping rested on proof that the total amounts paid to the recordkeeper exceeded market costs for Plan services. Id. at 332-33 (quoting Tussey, 2012 WL 1113291, at *2).  Plaintiff in this case neither alleges, argues, nor cites any evidence capable of proving that the total amount paid to the Plan's recordkeeper exceeds market rates for Plan services.

In Harmon the plaintiffs asserted inter alia claims against both the plan recordkeeper, Fidelity (Count IV), and the plan sponsor, Shell (Count V), for breach of fiduciary duty by sharing plan participant data with affiliates for the purpose of benefitting the recordkeeper and the sponsor, i.e., not for the exclusive purpose of providing benefits to plan participants and beneficiaries.  2021 WL 1232694, at * 2.  After determining that plan participant data are not plan assets under ERISA, the court dismissed the breach of fiduciary duty claim against the recordkeeper.  Id. at 3 (dismissing Count IV).  Plaintiff argues that Harmon is inapplicable to the facts of this case because

> [j]ust like in Tussey, the plaintiff alleged that Shell
> Oil and Fidelity were liable for plan losses stemming
> from excessive compensation that Fidelity received from
> the plan in that case.  And like in Tussey, the court
> dismissed all claims against Fidelity on grounds that
> Fidelity was not an ERISA fiduciary with respect to its
> own compensation.  Harmon v. Shell Oil Comp., et al.,
> 2021 WL 1232694, at *3, No. 3:20-cv-00021, (S.D. Tex[.]
> Mar. 30, 2021). . . Again, the court found that the duty
> to monitor, negotiate, and control compensation paid to

the plan's recordkeeper fell on the shoulders of the plan sponsor (Shell Oil). Accordingly, in that case plaintiff's ERISA claims against Shell Oil survived the motion to dismiss and the court recently certified a nationwide class in that case. <u>Harmon</u> does not support Defendant's arguments.[110]

Plaintiff mischaracterizes <u>Harmon</u>. The dismissed breach of fiduciary duty claim that Defendant cites and Plaintiff attempts to distinguish was Count IV, which alleged misuse of plan participant data and had nothing to do with payment of excessive compensation. Moreover, contrary to Plaintiff's argument that a corresponding claim asserted against the plan sponsor was not dismissed, the court entered a separate order dismissing the corresponding claim asserted against the plan sponsor, <u>i.e.</u>, Count V, stating that "[a]s the court explains in its memorandum opinion and order granting the [recordkeeper] defendants' motions to dismiss (Dkt. 138), participant data are not 'plan assets' under ERISA."[111] Although the plaintiffs in <u>Harmon</u> also asserted breach of fiduciary duty claims against the plan sponsor for payment of unreasonable record keeping fees, <u>i.e.</u>, Count I, that claim does not rest on

---

[110]<u>Id.</u> at 21 (referencing without citing a Memorandum and Recommendation to grant Plaintiffs' motion for class certification issued over two years later, <u>Harmon v. Shell Oil Co.</u>, Civil Action No. 3:20-cv-00021, 2023 WL 5758889, at *1 (S.D. Tex. September 6, 2023), Report and Recommendation Adopted by 2025 WL 366296 (S.D. Tex. February 3, 2025)).

[111]Order, Docket Entry No. 139 in Civil Action No. 3:20-cv-00021 (dismissing <u>inter alia</u> Count V). <u>See also</u> First Amended Complaint, Docket Entry No. 84, pp. 87-89 ¶¶ 228-240 (Count IV asserted against the Fidelity defendants corresponds to Count V asserted against the Shell defendants).

alleged payment of float income but, instead, on alleged payment of "excessive revenue sharing."[112]  See Harmon, 2023 WL 5758889, at *1 (describing Count I asserted against the Shell defendants). Moreover, as in Tussey, the breach of fiduciary duty claim for payment of excessive record keeping fees rests on allegations that the total amounts paid to the recordkeeper, i.e., direct and indirect compensation, exceeded market rates for the same services,[113] allegations that do not exist in this case.

The In re Fidelity ERISA Float Litigation case involved claims for breach of ERISA's fiduciary duty of loyalty, 29 U.S.C. § 1104(a)(1), and that section of ERISA that prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account.  29 U.S.C. § 1106(b)(1)."  829 F.3d at 59. The plaintiffs alleged that

> Fidelity used float to defray bank expenses and, if there
> was any remainder, distributed it to the investment fund
> from which the principal came.  Plaintiffs maintain[ed]
> that ERISA's fiduciary mandates required float to be
> credited instead to the plans, where . . . it would inure
> indirectly to the benefit of all participants.

Id.  The district court granted Fidelity's motion to dismiss

---

[112]First Amended Complaint, Count I, Docket Entry No. 84 in Civil Action No. 3:20-cv-00021, pp. 81-83 ¶¶ 204-211.  Neither float nor float income is mentioned in the operative complaint.

[113]Id. at 81-82 ¶ 207 (alleging that "compensation paid to the recordkeeper . . . exceed[s] a reasonable fee for the services provided").  See also id. at 53 ¶ 137 (alleging that the "Shell Defendants failed to analyze whether the direct and indirect compensation paid to [the plan recordkeeper], including revenue sharing . . ., was reasonable compared to market rates for the same services").

holding that the plaintiffs' complaint did not allege facts capable of establishing that the float interest at issue should be treated as a plan asset. Id. Alternatively, "[t]he district court . . . concluded that, even if float were a plan asset, Fidelity was not acting as an ERISA fiduciary when dealing with float." Id. n. 6. See also In re Fidelity ERISA Float Litigation, 2015 WL 1061497, at *9. Concluding that the plaintiffs failed to allege facts capable of establishing that float should be treated as a plan asset, the First Circuit affirmed the district court's dismissal of Fidelity. In re Fidelity ERISA Float Litigation, 829 F.3d at 56 and 64. The First Circuit noted that there was no need to address the district court's alternative conclusion that "even if float were a plan asset, Fidelity was not acting as an ERISA fiduciary when dealing with float." Id. at 59 & n. 6.

Plaintiff attempts to distinguish In re ERISA Float Litigation by arguing that "[a]s in Tussey and [Harmon], the court found Fidelity was not an ERISA fiduciary to plans for whom it serves as a recordkeeper with respect to Fidelity's own compensation from the plans,"[114] and that because "Plaintiff here has not sued the Plan's recordkeeper[,] . . . the crux of the analysis and holding [of this case] is not applicable."[115] But as Defendant argues

---

[114]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, p. 21.

[115]Id. at 21-22.

> [t]his is incorrect.  The Court of Appeals for the First
> Circuit did not hold that <u>because Fidelity is a</u>
> <u>recordkeeper</u> it does not owe a fiduciary duty to the
> treatment of float or its own compensation.  Rather, it
> held that float income from a transfer payment of
> investment gains is not a plan asset and no fiduciary
> duty applies to its treatment.[116]

<u>See</u> <u>id.</u> at 59-64.

Plaintiff also argues that the First Circuit's holding in <u>In</u> <u>re Fidelity ERISA Float Litigation</u> is inapplicable to the facts of this case because, unlike the plaintiffs in that case, he has not alleged that float is a plan asset, or that the plan's recordkeeper is barred from being compensated via float.[117]  Plaintiff argues that he "simply alleges that float is a source of compensation that the Plan's recordkeeper receives **from the Plan** for services . . . provide[d] to the Plan."[118]  But as Defendant points out, Plaintiff "conflate[d] float with plan assets in his Complaint [ECF 1, ¶¶ 38, 67, 72], and only in later briefing clarified that he was not making such allegations."[119]  Moreover, Plaintiff's argument "that float is a source of compensation that the Plan's recordkeeper receives **from the Plan** for services,"[120] similarly conflates float

---

[116]Defendant's Reply in Support of Its MSJ, Docket Entry No. 60, p. 12.

[117]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, p. 22.

[118]<u>Id.</u> (emphasis added).

[119]Defendant's Reply in Support of Its MSJ, Docket Entry No. 60, p. 12.

[120]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, p. 22 (emphasis added).

with plan assets.    Therefore, the court  finds the holdings in
<u>Tussey</u>,  <u>Harmon</u>,  and  <u>In re Fidelity ERISA Float Litigation</u>,
persuasive, and does not find persuasive Plaintiff's contention
that he has not alleged and, therefore, need not prove that float
is a plan asset in order to prevail on his claim that Defendant
breached its fiduciary duty of prudence by "fail[ing] to monitor or
control the excessive compensation paid for record keeping services
via float."[121]

>    2.    <u>Plaintiff Fails to Cite Evidence Capable of Establishing
>          that Defendant Breached Its Fiduciary Duty of Prudence</u>

Defendant argues that even if as Plaintiff contends, it owed
a fiduciary duty to its treatment of float, Plaintiff is unable to
cite evidence capable of establishing that it breached its duty of
prudence because "[t]he undisputed evidence shows that the Plan's
recordkeeper, Empower, does not receive indirect compensation via
float income."[122]   Defendant also argues that Plaintiff's claim
fails because Plaintiff is unable to cite evidence capable of
establishing that any compensation the Plan recordkeeper received
via float was excessive, or that Defendant failed to monitor or
control for excessive compensation paid to the Plan recordkeeper.[123]
Asserting that Defendant has a duty to defray Plan expenses,

---

[121]CAC, Docket Entry No. 1, p. 17 ¶ 71.

[122]Defendant's MSJ, Docket Entry No. 53, p. 20.

[123]<u>Id.</u> at 24-28.

Plaintiff responds that fiduciaries must prudently select third-party service providers and can be subject to liability if they do not reasonably monitor the fees charged and the fees are excessive.[124]

          (a)   Plaintiff Fails to Cite Evidence Capable of Establishing that the Plan's Recordkeeper Received Excessive Compensation

Defendant argues that Plaintiff is unable to cite evidence capable of establishing that the Plan's recordkeeper received compensation via float or that the Plan paid excessive compensation for record keeping services.[125]  Plaintiff responds that

> Defendant contends the Plan's recordkeeper's compensation was limited to $34.00 per participant, per year — which was paid directly by Plan participants to the recordkeeper. . . Defendant further contends that the Plan's recordkeeper received no compensation via float. . . However, Defendant executed a written fee agreement with the Plan's recordkeeper that shows the Plan's recordkeeper pockets far more than $34.00 per plan participant, per year.  <u>See</u> Exhibit 2-D to McKay Decl., ¶¶ 5-6, Schedule B — Fee Schedule at 10-12.  Defendant's argument that the recordkeeper receives only $34.00 per plan participant annually is demonstrably false. . . The undisputed evidence of record unequivocally proves that Defendant does not know what the recordkeeper receives for providing services to the Plan. . . Moreover, the written agreement specifically provides that the Plan's recordkeeper receives indirect float compensation from the Plan. . . Indeed, the relevant language in the written fee agreement provides as follows:

---

[124]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, p. 24.

[125]Defendant's MSJ, Docket Entry No. 53, pp. 24-28.

> Several of [the recordkeeper's] Services
> involve the temporary deposit of Client or
> Participants funds in a [recordkeeper] account
> until the funds are transferred to another
> party and/or until a check is cashed. Such
> balances will generally be invested in
> interest bearing accounts or other short-term
> investments, and **the earnings will be retained
> by [the recordkeeper].**

Id. at 13 (the referenced language highlighted in red
box) (emphasis added). The written agreement alone ought
to be enough to defeat Defendant's Motion.[126]

Plaintiff also cites the report of Defendant's expert witness, Adel

Turki, as evidence that the Plan's recordkeeper received indirect

compensation via float.[127]

### (1) Plaintiff Fails to Cite Evidence Capable of Establishing that the Plan's Recordkeeper Received Indirect Compensation Via Float

Plaintiff argues that the quoted fee agreement contradicts the

Defendant's assertions that float income is not part of the

recordkeeper's compensation, but that agreement is with the Plan's

previous recordkeeper, Alight, not the current recordkeeper,

Empower.[128] Undisputed evidence establishes that Empower replaced

---

[126]Plaintiff's Opposition to Defendant's MSJ, Docket Entry
No. 58, pp. 7-8 (citing Schedule B — Fee Schedule, Exhibit 2-D to
McKay Declaration, Docket Entry No. 58-7, p. 13).

[127]Id. at 25 (citing Expert Report L. Adel Turki, Ph.D. ("Turki
Report"), pp. 1-2 ¶¶ 6-7, Exhibit 2-F to McKay Declaration, Docket
Entry No. 58-9, pp. 3-4).

[128]Schedule B — Fee Schedule, Exhibit 2-D to McKay Declaration,
Docket Entry No. 58-7, p. 2.

Alight as the Plan's recordkeeper on January 1, 2020.[129]  Plaintiff cites no evidence of comparable language in Defendant's agreement with Empower, which assesses an annual fee of $34.00 per participant.[130]  Although ERISA's six-year statute of limitations extends back to Alight's time as the Plan's recordkeeper, Plaintiff expressly alleges that Defendant paid "unreasonable and excessive compensation for record keeping and other administrative services to the Plan's recordkeeper, Empower Retirement."[131]  Moreover, the Plan's manager, Dan Webber, testified that Empower is compensated based solely on a set fee structure of approximately $34.00 per participant per year,[132] and that float income from sweep accounts that the recordkeeper maintains for the Plan was transferred to the Plan's Expense Account and used to defray Plan expenses, including e.g., for accountants and attorneys.[133]

---

[129]CAC, Docket Entry No. 1, p. 3 ¶ 6.  See also Plaintiff's Motion for Class Certification, Docket Entry No. 42, p. 11 n. 1 ("On January 1, 2020, Defendant caused the Plan to change its recordkeeper from Alight Solutions to Empower Retirement."); Defendant's Opposition to Class Certification, Docket Entry No. 43, p. 11 (acknowledging that Empower is the Plan's recordkeeper).

[130]Administrative Services Agreement, Exhibit 2-M to the Declaration of Dan Webber ("Webber Declaration"), Docket Entry No. 43-16, p. 103.

[131]CAC, Docket Entry No. 1, p. 3 ¶ 6.

[132]Defendant's MSJ, Docket Entry No. 53, p. 10 (citing Video Deposition of Dan Webber ("Webber Deposition"), 50:19-59:7, Docket Entry No. 42-2, pp. 303-05; Webber Declaration, pp. 3-4 ¶¶ 7-8, Docket Entry No. 43-3, pp. 4-5; Empower Fee Disclosures for 2022 and 2023, Docket Entry Nos. 43-19, p. 12 and 43-20, p. 12).

[133]Defendant's Reply, Docket Entry No. 60, p. 17 (citing Webber
(continued...)

Plaintiff's argument that the Turki Report shows that the Plan's recordkeeper received indirect compensation via float mischaracterizes the Turki Report.[134]  In pertinent part the report states that

- From January 2020 through June 2023, Empower transferred a total of $300,731.21 it earned as "float income" to a U.S. Bank account that was controlled by the Plan.  Float income was used to pay bank charges of $34,197.57 over the same period.  The remaining $266,533.64 from that account was transferred to a Northern Trust account for the BHI - Thrift Plan Expense . . . to pay for Plan expenses such as recordkeeping and other administrative services.  Therefore, the entire float income associated with the Empower recordkeeping services was used to pay Plan expenses and it does not appear that the float income was kept by Empower as additional compensation for its record keeping services.[135]

When questioned at his deposition if Empower received float income as additional compensation, Turki responded that he did not believe so.[136]  The Turki Report and deposition testimony show that the Plan's recordkeeper maintained Plan accounts that earned float income, that the float income was used to pay bank expenses for the

---

[133](...continued)
Deposition, 18:11-25:7, 48:23-59:7, and 83:9-84:5, Docket Entry No. 42-2, pp. 295-96, 302-05, and 311; Webber Declaration, pp. 3-4 ¶¶ 7-8 and 10, Docket Entry No. 43-3, pp. 4-5).

[134]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, pp. 9, 25 (citing Turki Report, pp. 1-2 ¶¶ 6-7, Docket Entry No. 58-9, pp. 3-4).

[135]Turki Report, p. 2 ¶ 6, Docket Entry No. 58-9, p. 4.

[136]Video Deposition of Adel Turki, Ph.D. ("Turki Deposition"), pp. 18:12-19:7, Docket Entry No. 53-2, p. 7.

account, and that whatever was left over was transferred to the Plan's expense account and used to pay Plan expenses, including e.g., for accountants and lawyers.   Contrary to Plaintiff's argument, the Turki Report does not show that the Plan's recordkeeper received indirect compensation via float.   Moreover, as additional evidence that the Plan's recordkeeper does not receive indirect compensation via float, Defendant has submitted emails exchanged between the Plan's manager, Webber, and the Plan's recordkeepers confirming that the recordkeeper is not receiving indirect compensation via float.[137]   Because Plaintiff cites no contradictory evidence, Plaintiff has failed to cite evidence capable of proving that the Plan's recordkeeper received indirect compensation via float.

> **(2)   Plaintiff Fails to Cite Evidence Capable of Establishing that Any Compensation the Plan's Recordkeeper Received Via Float was Excessive**

Plaintiff alleges that "Defendant caused the Plan to pay unreasonable and excessive compensation for . . . services to the

---

[137]See Emails attached to the Declaration of Dan Webber dated November 25, 2024, 2018 Email, Exhibit 15-1, Docket Entry No. 60-10, p. 2 ("We have not identified any 2017 indirect compensation that Alight received related to  . . . administrative services for Baker Hughes . . . 401(k) Plan."); 2021 Emails Exhibit 15-2, Docket Entry No. 60-11, p. 3 ("We did not receive any indirect compensation [in 2020]."); and 2019 Emails, Exhibit 15-3, Docket Entry No. 60-12, p. 2 (confirming that Alight did not receive any indirect compensation in 2018).

Plan's recordkeeper."[138]    Even if Plaintiff was able to cite
evidence capable of establishing that the Plan's recordkeeper
received indirect compensation via float, Defendant argues that
Plaintiff is unable to cite evidence capable of establishing that
the recordkeeper's compensation was unreasonable or excessive
compared to the market.[139]

Asserting that "Defendant argues it has no duty to defray Plan
expenses,"[140]Plaintiff responds that this argument is misplaced
because he

> has not alleged that Defendant caused the plan to pay
> "excessive fees" to the Plan's recordkeeper relative to
> other plans.  Rather, Plaintiff alleges that Defendant
> breached its duty of prudence by allowing the
> recordkeeper to pocket float income without proper
> diligence, understanding, and any meaningful effort to
> defray plan expenses by including the float income in the
> recordkeepers total compensation.  Plaintiff alleges that
> a prudent fiduciary would have included the float income
> received by the recordkeeper in negotiations with the
> recordkeeper to defray, offset, or eliminate entirely the
> direct or other forms of compensation that the Defendant
> caused the Plan to pay the recordkeeper.[141]

Without citing any authority, Plaintiff contends that Defendant's
argument lacks merit "because the parties are long past the

_____

[138]CAC, Docket Entry No. 1, pp. 2-3 ¶ 6.

[139]Defendant's MSJ, Docket Entry No. 53, pp. 24-28.

[140]Plaintiff's Opposition to Defendant's MSJ, Docket Entry
No. 58, p. 24 (citing Defendant's MSJ, Docket Entry No. 53, p. 20
("Even if, arguendo, one was to accept plaintiff's imagined duty
regarding monitoring float, he provides no evidence that defendant
has breached this imagined requirement.")).

[141]Id. at 26.

pleading stage[, and v]irtually all of the opinions Defendant provides in its Motion are opinions addressing the adequacy of pleadings . . . in response to motions to dismiss."[142]

Plaintiff's arguments misapprehend the Defendant's arguments and the law.  Defendant does not dispute that it has a duty to defray plan expenses.  To the contrary, Defendant cites uncontradicted evidence that float income earned from accounts maintained by Empower is funneled into the Plan's expense account and used to defray Plan expenses.[143]  Nor does Defendant's MSJ challenge the adequacy of Plaintiff's pleadings.  Defendant challenges Plaintiff's ability to cite evidence needed to establish that Defendant's actions breached its fiduciary duty of prudence.

The duty of prudence requires plan fiduciaries to act "with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  See also Tibble,135 S. Ct. at 1828.  The prudence standard is measured according to the objective prudent person standard developed in the common law of trusts.  The prudence standard is, therefore, inherently comparative.  See Spence v.

---

[142]Id. at 27.

[143]Defendant's MSJ, Docket Entry No. 53, pp. 20-23, and 26-28 (and the record evidenced cited therein).

American Airlines, Inc., No. 4:23-cv-00552-O, 2025 WL 225127, at
* 21 (N.D. Tex. January 10, 2025). "Courts evaluate this standard
by examining "the conduct of similarly situated fiduciaries." Id.
(citing inter alia Cunningham v. Cornell University, 86 F.4th 961,
983-85 (2d Cir. 2023), cert. granted, No. 23-1007, 2024 WL 4394127
(U.S. Oct. 4, 2024) (affirming grant of summary judgment where the
fiduciary's processes were consistent with prevailing standards
during relevant time period); Sweda v. University of Pennsylvania,
923 F.3d 320, 330 (3d Cir. 2019) (recognizing that ERISA
fiduciaries' performance must be evaluated against "contemporary
industry practices"); and California Ironworkers Field Pension
Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1044 (9th Cir. 2001)
(finding no error in reliance on evidence that "the Bloomberg
system was the tool prevalently used in the industry" to conclude
that fiduciaries had acted prudently)).

Plaintiff alleges that Defendant breached its duty of prudence
by allowing the recordkeeper to pocket float income by including it
in the recordkeeper's total compensation, and that a prudent
fiduciary would have included the float income received by the
recordkeeper in negotiations with the recordkeeper to defray,
offset, or eliminate entirely the direct compensation that the
recordkeeper received.[144]    But Plaintiff has neither alleged,

---

[144]Plaintiff's Opposition to Defendant's MSJ, Docket Entry
No. 58, p. 26.

argued, nor cited any evidence capable of establishing how much the Plan's recordkeeper was compensated, via float or otherwise. Nor has Plaintiff alleged, argued or cited any evidence capable of establishing that by including float income in negotiations with the recordkeeper, a prudent fiduciary could have offset or eliminated the recordkeeper's direct compensation. In other words, despite asserting that "the Plan's recordkeeper pockets far more than $34.00 per plan participant, per year,"[145] Plaintiff has failed to cite any evidence capable of proving how much the Plan's recordkeeper has been compensated for Plan services, or that whatever the recordkeeper has been compensated is unreasonable or excessive compared to what "a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Because Plaintiff has failed to cite evidence capable of proving that the Plan's record keeping fees exceed what the Plan should have paid for comparable services, Plaintiff has failed to raise a fact issue for trial.

> (b) Plaintiff Fails to Cite Evidence Capable of Establishing that Defendant Failed to Monitor or Control for Excessive Compensation Paid to the Plan's Recordkeeper

Plaintiff alleges that "Defendant breached its fiduciary

---

[145]Id. at 7-8 (citing Schedule B — Fee Schedule, Exhibit 2-D to McKay Declaration, Docket Entry No. 58-7, p. 13).

duties by "fail[ing] to monitor or control the excessive compensation paid for record keeping services via float,"[146] and that "Defendant wasted Plan assets by failing to consider and include the compensation Defendant received from the plan via float."[147] Defendant argues that Plaintiff is unable to cite evidence capable of establishing that Defendant failed to monitor or control excessive compensation paid for record keeping services.[148] Plaintiff responds by citing the deposition testimony of two individual Plan trustees, who had no idea what float is or how the Plan spent it.[149] Plaintiff cites this testimony as evidence that Defendant imprudently failed to include float income in negotiations with the recordkeeper to defray, offset, or eliminate entirely the recordkeeper's direct compensation.[150]

The Fifth Circuit considered and rejected a similar argument in Kopp v. Klein, 894 F.3d 214, 220-21 (5th Cir. 2018) (per curiam). There, plan beneficiaries argued that separate and "apart from any substantive imprudence[,] the [d]efendants breached their

---

[146]CAC, Docket Entry No. 1, p. 17 ¶ 71.

[147]Id. ¶ 72.

[148]Defendant's MSJ, Docket Entry No. 53, pp. 24-28.

[149]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, pp. 9-12 (citing Deposition Taken by Remote Videoconference of Harry Elsinga, pp. 26:14-16 and 30:13-16, Exhibit 2-G to McKay Declaration, Docket Entry No. 58-10, pp. 3 and 4; and the Deposition of Deanna Jones, pp. 18:1-3, and 25:4-22, Exhibit 2-H to the McKay Declaration, Docket Entry No. 58-11, pp. 3 and 4).

[150]Id. at 26.

'procedural' duty of prudence by failing to meet and discuss a possible course of action regarding the Plan's investment in [a challenged] stock." Id. Their claim failed, however, as it rested solely on the fiduciaries' procedural lapses.  The Fifth Circuit explained that a

> duty-of-prudence claim cannot rest solely on the Defendants' procedural failings.  Instead, [plaintiff] must allege facts to support the conclusion that the Defendants would have acted differently had they engaged in proper monitoring — and that an alternative course of action could have prevented the Plan's losses.

Id. at 221.  Here, Plaintiff has failed to allege or to cite evidence capable of establishing that Defendant would have engaged in an alternative course of action that could have prevented the alleged Plan losses if it had properly monitored float income. Instead, Plaintiff argues that a prudent fiduciary would have used float income in negotiations with the recordkeeper to defray, offset, or eliminate entirely other forms of compensation received from the Plan.[151]  But Plaintiff has neither identified a plan that has successfully negotiated such terms with a recordkeeper, or a recordkeeper that has agreed to accept float income to defray, offset, or eliminate entirely other forms of compensation.  The court, therefore, concludes that Plaintiff has failed to cite evidence capable of establishing a breach of fiduciary duty claim for failing to monitor or control excessive compensation paid to the Plan's recordkeeper.

---

[151] Id.

3.   Plaintiff Fails to Cite Evidence Capable of Establishing
that Any Breach of Fiduciary Duty Caused Loss to the Plan

Asserting that undisputed evidence establishes that "float income generated in the recordkeeper Empower's Sweep Accounts was transferred to the Plan's Expense Account and used to pay Plan expenses,"[152] Defendant argues that Plaintiff is unable to cite evidence capable of establishing that the Plan suffered any loss due to Defendant's actions.[153]

Plaintiff responds by citing the services agreement with the Plan's prior recordkeeper, Alight, the Turki Report, and the testimony of his expert witness, Otto.[154]  Plaintiff argues that the Alight services agreement and the Turki Report establish that the Plan's recordkeeper received compensation via float, and that Otto "opines that Defendant's breaches caused the Plan losses as high as $7,843,878."[155]  Citing McDonald, 60 F.3d at 237, Plaintiff argues that the Fifth Circuit has adopted a burden-shifting rule that requires any doubt or ambiguity regarding the amount of plan losses to be resolved against the breaching fiduciary.[156]

---

[152]Defendant's MSJ, Docket Entry No. 53, p. 22.

[153]Id.

[154]Plaintiff's Opposition to Defendant's MSJ, Docket Entry No. 58, pp. 24-25.

[155]Id. at 28.

[156]Id. at 25.  See also Plaintiff's Opposition to Defendant's Motion to Exclude Otto Testimony, Docket Entry No. 57, p. 27.

For the reasons stated in § III, above, the court has concluded that Defendant's Motion to Exclude Otto's report and testimony should be granted. Therefore, the court will not consider Otto's report. For the reasons stated in § IV.C.2(a)(1), above, the court has already discussed — and rejected — Plaintiff's reliance on the Alight services agreement and the Turki Report as evidence that the Plan's recordkeeper receives indirect compensation via float. Moreover, even if the court were to find that the Alight services agreement and the Turki Report constitute evidence that the recordkeeper received indirect compensation via float, neither of those sources show any loss to the Plan. Under McDonald, 60 F.3d at 237, the burden of persuasion does not shift to a defendant fiduciary until an ERISA plaintiff makes a prima facie showing of loss to a plan. See Smith v. Prager, 154 F.3d 417, 1998 WL 526637, at *2 (5th Cir. 1998) (per curiam); Timmons v. Special Insurance Services, Inc., 167 F.3d 537, 1998 WL 915366, at *1 (5th Cir. 1998) (per curiam). See Cunningham, 86 F.4th at 981-82 (affirming grant of summary judgment on plaintiffs' claim that defendants breach fiduciary duty of prudence in failing to monitor and control recordkeeper fees upon concluding that plaintiffs failed to meet their burden as to loss).

**D.   Conclusions**

The court concludes that Defendant is entitled to summary judgment on Plaintiff's claim for breach of the fiduciary duty of prudence because Plaintiff has failed to produce evidence capable of establishing that Defendant owes a fiduciary duty to its treatment of float, and alternatively, because Plaintiff has failed to cite evidence capable of establishing that Defendant breached its fiduciary duty of prudence, or that any such breach caused a loss to the Plan.

**V.   Conclusions and Order**

For the reasons stated in § II, above, Plaintiff's Motion to Compel Defendant to Produce Additional Documents Responsive to Plaintiff's First Request for Production of Documents, Docket Entry No. 48, is **DENIED as MOOT**; and Plaintiff's Motion to Compel Documents and Testimony that Have Been Wrongfully Withheld Based on Attorney Client Privilege, Docket Entry No. 49, is **DENIED as MOOT**.

For the reasons stated in § III, above, Defendant's Motion to Strike and Exclude Report of Al Otto, Docket Entry No. 44, is **DENIED as MOOT**; and Defendant's Motion in Limine to Exclude Testimony of Al Otto, Docket Entry No. 54, is **GRANTED**.

For the reasons stated in § IV, above, Defendant's Motion for Summary Judgment, Docket Entry No. 53, is **GRANTED**.

Because the court has granted Defendant's Motion for Summary Judgment, Plaintiff's Motion for Class Certification, Docket Entry No. 42, is **DENIED as MOOT.**

**SIGNED** at Houston, Texas, on this 10th day of February, 2025.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE